UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Carolyn Russell,

       Plaintiff,

v.

                                    Case No. 2:05-CV-00142
                                    JUDGE SMITH
                                    Magistrate Judge King

State of Ohio, Department of
Administrative Services, *et al.*,

       Defendants.

## OPINION AND ORDER

Plaintiff Carolyn R. Russell ("Plaintiff" or "Russell"), who is proceeding *pro se*, brings this action against the Ohio Department of Administrative Services ("ODAS") and George Hess (collectively "Defendants"). Plaintiff alleges that Defendants have failed to promote or reclassify her, have taken job duties away from her, have subjected her to a racially hostile work environment, and have otherwise discriminated against her, because of her African American race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1983. Plaintiff has also petitioned the Court for injunctive relief from Defendants' alleged ongoing retaliation against Plaintiff for filing an EEOC charge (Doc. 41). Defendants have moved for summary judgment with respect to all claims (Doc. 35). For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 35) and **DENIES** Plaintiff's Petition for Injunctive Relief (Doc. 41).

## I.  FACTUAL BACKGROUND

**A.     Plaintiff's Early Work History**

In 1962, Plaintiff Russell began working for the State of Ohio.  In 1972, Plaintiff began working for the Equal Employment Opportunity division ("EOD") of the Department of Public Works, where she obtained the classification of Administrative Assistant 2 ("AA2").  In late 1985, Plaintiff began working for the Minority Set Aside Review Board until her position was abolished in 1997.  At that time, Plaintiff was transferred to the Division of Computer Services, which is known today as the Office of Information Technology Services Delivery Division ("ITSD"), which is located at the State of Ohio Computer Center ("SOCC").

The AA2 Position Plaintiff transferred to at the SOCC was never posted, nor did Plaintiff ever apply for the AA2 position.  Plaintiff testified that an AA2 already worked in her new office, and although there was no need for a second AA2, in her opinion, a position was created for her.  Plaintiff currently works at the SOCC and remains an AA2.

**B.     Ohio's Civil Service Classification System**

  **1.     Reclassifications, Promotions, and Transfers**

Under Ohio civil service law, a "classification" is "a group of positions sufficiently similar in respect to duties, responsibilities, authority, and qualifications so that the same descriptive title may be used for each, the same pay range assigned, and the same examinations conducted." O.A.C. § 123:1-47-01(A)(21). A "position" is "the group of job duties intended to be performed by an individual employee as assigned by the appointing authority." O.A.C. § 123:1-47-01(A)(62).

O.R.C. § 124.14(A) requires that the Director of ODAS establish a classification plan, including various classifications assigned to particular pay ranges. The classification plan for classified, non-bargaining-unit employees is set forth at O.A.C. § 123:1-7-15. ODAS must then,

by administrative rule, promulgate classification specifications that describe the essential character and minimum qualifications for each classification. O.A.C. § 123:1-7-04. Russell, as an AA2, falls within the Administrative Assistant classification series.

An employee seeking to change their classification, may obtain a reclassification or a promotion. A "reclassification," is "the act of changing the classification of an existing position." O.A.C. § 123:1-47-01(A)(73); *see also* O.R.C. § 124.01(J). A "reclassification" can be initiated by ODAS or the employee. ODAS may reclassify a position on its own accord, or either the employer (in this case, also ODAS) or the employee can request that ODAS perform a "job audit." O.R.C. § 124.14(D)(1); O.A.C. § 123:1-3-01(C).

Such an audit is performed (and reviewed on appeal to the State Personnel Board of Review) by comparing the actual duties of the position to the class specifications and assigning the position to the classification "which most accurately describes the duties performed." O.A.C. 123:1-3-01(D); O.A.C. § 124-7-03(C). That is, one is looking for the closest match. *Dept. of Mental Retardation & Developmental Disabilities v. Dept. of Administrative Servs.*, 44 Ohio App.3d 144, 145, 541 N.E.2d 1064 (Franklin 1988).[1] To obtain a higher classification, the employee must be performing job duties of the higher classification at least 20% of the time. O.A.C. § 123:1-3-01(D). When reviewing a position for reclassification, the focus is limited to the job duties the employee is performing at the time of the request. O.A.C. § 123:1-3-01(F).

In contrast to the "reclassification" of an existing, occupied position, a "promotion" is "the movement of an employee from one position to a vacant position which is assigned to a different

---

[1]The employee may further appeal SPBR's review of ODAS's classification decision to common pleas court pursuant to O.R.C. § 119.12. *See e.g., Ford v. Ohio Dept. of Natural Resources,* 67 Ohio App.3d 755 (1990).

3

classification and a higher pay range…." O.A.C. § 123:1-47-01(A)(69). A "promotion" requires a

vacancy, and the employee must ordinarily apply for the promotion. *See* O.R.C. § 124.31.

Finally, an employee may also be "transferred" to a different classification. A transfer occurs

when a person holding a position in the classified service is "transferred to a similar position in

another office, department or institution having the same pay and similar duties." O.R.C. § 124.32.

### 2.     The Administrative Assistant Classification Series

The classification specifications explain the distinctions between classifications in the

Administrative Assistant ("AA") classification series, which turn mainly on the degree to which the

incumbent's duties are "routine," and involve the formulation of "policy" on behalf of superiors.

According to the "series purpose":

> At the first level [AA1], incumbents relieve superior of *routine administrative duties*. At the second level [AA2], incumbents relieve superior of *non-routine administrative duties & formulates & implements program policy* &/or supervises assigned staff. At the third level [AA3], incumbents relieve superior *of variety of difficult administrative duties & formulates & implements program policy* &/or supervises assigned staff. At the fourth level [AA4], incumbents relieve superior of *most difficult administrative duties & formulates & implements policy* or does all of the proceeding & supervises assigned staff.

Plaintiff was classified as an AA2. The "class concept" for an AA2 is:

> The advanced level class works under general supervision & requires considerable knowledge of management principles/techniques, supervisory principles/techniques & agency policies & procedures regarding program activities of unit, section, division or bureau in order to assist in program direction by relieving superior of non-routine administrative duties & formulate & implement program policy, or to do all of preceding & supervise assigned staff.

The "class concept" for the next highest classification, AA3, is:

> The first administrative level class works under administrative direction & requires thorough knowledge of management principles/techniques, supervisory principles/techniques & agency policies & procedures regarding program activities of unit, section, division or bureau in order to assist in program direction by relieving superior of variety of difficult administrative duties & formulate & implement program

4

policy, or to do all of preceding & supervise assigned staff.

C.     **Plaintiff's Work History at the SOCC**

Since Plaintiff's arrival at the SOCC in 1997, she has had four different direct supervisors.  Plaintiff's first direct supervisor was Peggy Walter.  On August 17, 2000, Plaintiff began working under the direct supervision of George Hess.  In July 2002, Plaintiff fell under Joyce Craddock's supervision, but remained under the indirect supervision of Hess. Finally, in January of 2004, when Patty Magazine began her position as the Human Resources Coordinator, Plaintiff began to report directly to Ms. Magazine. (Russell Depo. at 14-15). Again, Mr. Hess remained Plaintiff's indirect supervisor.

   1.     **Job Duties Under Peggy Walter**

Plaintiff was moved to the SOCC when her previous position was abolished. Ms. Walter became her direct supervisor.  Ms. Walter was not in need of an AA2 when Plaintiff arrived. (Russell Depo. at 181). While directly supervised by Ms. Walter, Plaintiff performed duties such as answering telephones, sorting and distributing mail, passing out magazines to managers and typing some personnel work. (Russell Depo. at 16).

   2.     **Job duties under George Hess**

On August 17, 2000, George Hess, a white male, became Plaintiff Russell's direct supervisor.  At this time, Hess was the administrator of the Office of Data Networks ("ODN"). Plaintiff Russell's job duties while working directly for Hess increased.  Plaintiff alleges that she was assigned the responsibility of performing all personnel functions of the ODN under Mr. Hess's direction and that she became a liaison between the Office of Employee Services ("OES") and ODN. (Russell Depo. at 17).  More specifically, Plaintiff would obtain paperwork from the fifteen ODN managers relating to job postings, position descriptions, and personnel

5

action forms and forward this information to OES. Essentially Plaintiff was a "go-between" for the managers and OES. (Russell Depo. at 17, 20).

Plaintiff asserts that she "coordinated the hiring process" at ODN. (Russell Depo. at 22). This entailed preparing and posting open positions, by typing into the posting template the information she received from the managers and retrieved from other documents. (Russell Depo. at 26). Once applications were submitted for the posted position, OES would send the applications to Plaintiff, who would give the applications to the hiring manager to review. (Russell Depo. at 22-23). After the manager had selected applicants to interview, Plaintiff would contact those applicants and schedule the interviews. (Russell Dep. 23). Plaintiff also forwarded the applicant's information to a security person within ODN so that background checks could be done. (Russell Depo. at 24). Once the applicant was hired, Plaintiff arranged the new employee's orientation. (Russell Depo. at 27). Setting up orientation included scheduling the employee for training that all new hires attended, and providing the employee with documents, which all new hires received. (Russell Depo. at 25-29). Plaintiff Russell set up the new employee's office by calling the appropriate people to have a computer and phone installed, and by stocking the office with the appropriate supplies. (Russell Depo. at 28).

Plaintiff Russell's other duties included updating position descriptions, which are updated every two years. At the appropriate time, Plaintiff contacted managers to remind them to update the position descriptions. Plaintiff was not involved in actually writing the position descriptions, because she was not a "technical" person. (Russell Depo. at 29). Plaintiff also helped to ensure that Personnel Evaluations were completed in a timely manner by keeping track of the due dates. (Russell Depo. at 30-31).

Plaintiff helped to process personnel action forms by filling in the information she

6

retrieved from various other documents such as the personnel control roster or the fundable table of organization ("FTO"). (Russell Depo. at 26). In the case of a new hire, Plaintiff Russell confirmed that the position for which the employee was being hired was located on the FTO. (Russell Depo. at 33-37).  If the position was not present on the FTO, Plaintiff might make suggestions to the manager, such as to combine two lower level positions into one higher position the manager would like to add in order to stay within the manager's budget. (Russell Depo. at 33-37). If the manager decided to make this change, Plaintiff would send a letter to the business office to have the FTO changed. (Russell Dep. 33-37).

Plaintiff Russell also used the FTO to create an internal Table of Organization ("TO"). (Russell Depo. at 32). The FTO already had the division organized, but the TO was changed each time a personnel action form was changed to reflect the current organization. Finally, Plaintiff Russell sometimes performed the basic duties of records retention, which consisted of marking boxes to be sent for storage. (Russell Depo. at 38).

### 3.  Job Duties Under Joyce Craddock and Plaintiff's Request for a Reclassification

Mr. Hess combined five different divisions, which included ODN, and brought them together under one division now called the Office of Information Technology Services Delivery Division ("ITSD"). (Russell Depo. at 49-50). Joyce Craddock, an African American, became Assistant Deputy of this new division in July 2002. (Craddock Depo. at 9, 15; Hess Depo. at 8). In combining these divisions, five new managers were added to the division as a whole. (Russell Depo. at 50). Plaintiff Russell began working for Ms. Craddock immediately after ITSD was formed. (Russell Depo. at 51-52).  Plaintiff  testified that when she first began working for Craddock, her duties remained the same as they had been when she had worked directly for

Hess. (Russell Depo. at 56).

In January 2003, Plaintiff Russell requested an upgrade in her classification. (Russell Depo. at 56). Per Ms. Craddock's request, Plaintiff wrote a position description for her own position and requested that she be placed in a higher classification based on that position description. (Russell Depo. Exh. 15; Pl's Memo. in Opp. at 7). Ms. Craddock reviewed Plaintiff's self-created position description and found that Plaintiff had listed numerous duties that she did not perform and skills that she had no opportunity to obtain. (Craddock Depo. at 38-39). Ms. Craddock forwarded Plaintiff's position description to OES to determine if Plaintiff was properly classified. (Craddock Depo. at 36). OES reviewed Plaintiff's duties and reported to Mr. Hess and Ms. Craddock that reclassification was not warranted. (Craddock Depo. at 36; Hess Depo. at 26).

Mr. Hess accepted and agreed with OES' findings and, on April 4, 2003, informed Plaintiff Russell that she would not be reclassified. (Hess Depo. at 26; Pl's Memo. in Opp. at 7). Plaintiff expressed to Mr. Hess that she "saw this denial as continual race discrimination and retaliation for filing an EEOC charge." (Pl's Memo. in Opp. at 7).  After being informed of Mr. Hess' decision, Plaintiff emailed Mr. Hess that she wished to be reclassified because ITSD personnel functions had been centralized. (Russell Depo. at Ex. 15).  Mr. Hess acknowledged that Plaintiff's volume of work may have increased due to the centralization, but maintained that reclassification was unwarranted because the nature of Plaintiff's duties remained the same. (Hess Depo. at 32).

Ms. Tyler, Mr. Hess and OES did not prepare a revised position description; nor did Plaintiff Russell request that OES conduct an audit of her job duties compared with her classification. (Pl's Memo. in Opp. at 7; Russell Depo. at 149, 154).  Although Plaintiff Russell

8

was aware that she could request an audit, she testified that she never made an effort to obtain one because she thought it would be futile to request an audit. (Russell Depo. at 155).  Plaintiff claims that the one person she knew who had requested an audit was demoted as a result because the audit concluded she performed the duties of a *lower* classification. (Russell Depo. at 156).

Plaintiff Russell alleges that her workload declined in the summer of 2003. (Pl's Memo. in Opp. at 8).  Plaintiff testified that she continued to perform the same duties, but that she noticed instead of working directly with managers, she now began working with the managers' administrative assistants. (Russell Depo. at 56-59, 99; Pl's Memo in Opp. at 8).  Plaintiff further testified that normally the AA's worked together while the managers worked directly with Ms. Craddock.  For instance, if the other AA's needed to communicate with Ms. Craddock, they did not bypass Plaintiff to do so. (Russell Depo. at 100).  At no time did Plaintiff Russell question the decrease in the volume of her work or the change from working with managers to working with her fellow AA's. (Russell Depo. at 56-59, 96).  Beyond this change, Plaintiff began using the Access Payroll system to complete personnel paperwork. She also served as a backup for the SOCC receptionist, served as a backup to answer the Deputy Director's phone and served as backup for the ITSD car pool. (Russell Depo. at 70; Ex. 1).

### 4.      Job duties under Patty Magazine

In January 2004, Patty Magazine was selected as Plaintiff Russell's new direct supervisor. As under Ms. Craddock, Plaintiff continued to work directly with AA's instead of directly with managers and her job duties still consisted of processing position descriptions, personnel action forms, and personnel evaluations. Plaintiff was to ensure that position descriptions were updated by adding information to the position description, adding cover sheets to the Position description, getting the appropriate signatures on the Position description while

working with other AA's and sending the position description to OES. (Russell Depo. at 64-65).

For a short period, Plaintiff Russell sent position descriptions that needed to be updated to managers for completion, but was later instructed to discontinue that practice by Ms. Magazine. (Russell Depo. at 81, 85).  Plaintiff alleges that this order came as a result of Ms. Magazine and Sheryl Beaty of OES "working on something" that did not include Plaintiff. (Russell Depo. at 82-84). Despite this change, Plaintiff continued processing the paperwork to update position descriptions. (Russell Depo. at 85).

When generating personnel action forms, Plaintiff Russell continues to verify that Position Control Numbers ("PCN") are correct and that positions are on the FTO. (Russell Depo. at 67, 92). Plaintiff alleges that she no longer writes cover letters for positions not on the FTO; that issue no longer arises because Plaintiff receives all the information for the personnel action forms from Ms. Magazine. (Russell Depo. at 67).  Plaintiff types the personnel action forms, gets signatures, and sends the personnel action forms to the Business Office. (Russell Depo. at 93).  If an employee is retiring, resigning or transferring, Plaintiff completes a personnel action form and sends an exit interview sheet to the relevant manager. (Russell Depo. at 87).  Once the manager completes the exit interview, the sheet is returned to Plaintiff who forwards it to OES. (Russell Depo. at 88).

Plaintiff also continues to monitor the completion of personnel evaluations.  Plaintiff gives managers both a 60-day and a 30-day reminder to begin working on personnel evaluations. (Russell Depo. at 89-90). Plaintiff receives the completed personnel evaluations from either a manager's administrative assistant or from Ms. Magazine. (Russell Depo. at 63, 90).  Plaintiff Russell then logs the personnel evaluations, and sends it to the Director and the employee for signatures. (Russell Depo. at 63). Finally, Plaintiff sends the personnel evaluations to OES.

(Russell Depo. at 63).  Plaintiff generates a monthly report for Ms. Magazine listing all the delinquent personnel evaluations. (Russell Depo. at 90).

**D.     Plaintiff's Allegations Regarding Caucasians who Received Promotions and Upgrades While She was Denied the Same Opportunities**

**1.     Lisa Barbee's Reclassification to AA4**

In 2001, when Mr. Hess became the Interim Deputy State CIO, he began to reorganize the SOCC by consolidating similar functions in the office to improve efficiency.  As part of that reorganization, a review of employees' positions descriptions was conducted and employees were identified whose job duties warranted reclassification to reflect the employees' actual job duties. (Russell Depo. at Ex. 9).  Lisa Barbee, a Caucasian, was one of the employees whose position was reviewed. (Russell Depo. at Ex.  9).

Ms. Barbee was classified as a Training Supervisor when Plaintiff Russell arrived at the SOCC in 1997. (Russell Depo. at 113).  Though Plaintiff was not familiar with Ms. Barbee's actual job duties, she observed Ms. Barbee working with training officers and other state employees in training. (Russell Depo. at 114).  Ms. Barbee performed other duties involving quality assurance and training or supervising training. (Hess Depo. at 35).  Ms. Barbee was also observed by Mr. Hess to be involved in special projects that related to building security and construction coordination, such as ensuring that materials were ordered and working with builders. (Hess Depo. at 37).

Based on Mr. Hess' observations, Mr. Hess asked OES to review whether Ms. Barbee was classified correctly. (Hess Depo. at 40-44).  OES reviewed Ms. Barbee's job duties and determined that Ms. Barbee was mis-classified and that she should be reclassified as an AA4. (Hess Depo. at 40). Ms. Barbee's reclassification was effective on July 28, 2002, and did not

11

result in any increase in pay. (Russell Depo. at 142; Ex. 8). After Ms. Barbee's reclassification, Mr. Hess abolished the training unit, where Ms. Barbee had previously served as the Training Supervisor. (Hess Depo. at 38).  In July 2003, Ms. Barbee became Mr. Hess's administrative assistant. (Pl's Memo. in Opp. at 13).  Mr. Hess did not post the position. *Id.*  Plaintiff was interested in the position because it would have been an upgrade for her. *Id.*  Plaintiff claims she was qualified for the position because she had served as an administrative assistant to five Deputy Directors in DAS.  On July 30, 2003, Ms. Russell filed a formal complaint with the OIG regarding the reclassification and re-positioning of Ms. Barbee.  In January 2003, Mr. Hess abolished his AA4 classification.

2.     **Angela Weis's lateral transfer to the SOCC as an AA3**

DAS was experiencing reorganizations in other divisions outside of the SOCC, which resulted in the abolishment of entire divisions. One such division was known as E-government, where Angela Weis, a Caucasian employee who was classified as an AA3, worked. (Russell Depo. at 175; Hess Depo. at 73).  OES began placing E-government employees into other divisions to save their jobs. (Hess Depo. at 73).  OES informed Mr. Hess that it wanted to place Ms. Weis in Enterprise Computing Services ("ECS"), a division that reports to Mr. Hess. (Hess Depo. at 74).

When Ms. Weis transferred to ECS, she maintained her AA3 classification and was placed under the direct supervision of Sam Van Sycock, who reports directly to Ms. Hess. (Hess Depo. at 74-75).  No AA3 position was ever posted as an open position at the SOCC prior to Ms. Weis' arrival. (Hess Depo. at 76).  Plaintiff Russell views Ms. Weis' transfer to ECS as another lost opportunity for Plaintiff and evidence of racial discrimination because Ms. Weis is white. (Russell Depo. at 177-178).

12

### 3. Patty Magazine's employment by ITSD to fill the MAS2/HRC position

On September 29, 2003, DAS posted an open position at ITSD, classified as Management Analyst Supervisor 2 ("MAS2"). (Russell Depo. at 186; Ex. 19). The working title for the position was Human Resources Coordinator ("HRC"). (Craddock Depo. at 17). The MAS2 classification is a general classification, used by many different agencies for varying purposes.

Listed on the job posting for the HRC position were Position Specific Minimum Qualifications ("PSMQ's"). PSMQ's are used to narrow the range of applicants for a position in a broad classification with general minimum qualifications, to those applicants who are most suited for the demands of the particular position. (Craddock Depo. at 24-25).  The applicants who receive interviews must meet the PSMQ's. (Craddock Depo. at 20).  In creating the PSMQ's for the MAS2/HRC position, Ms. Craddock worked with OES and the Human Resources Division ("HRD") to ensure that only applicants with a high level of personnel experience could fill the position. (Craddock Depo. at 25-26).

Initially, Ms. Craddock created the MAS2/HRC position description, to which she added the PSMQs. (Craddock Depo. at 26). Ms. Craddock then forwarded the position description to OES, which reviewed the position description, including the PSMQs, for appropriateness based on the job classification and position that was being posted. (Craddock Depo. at 26).  After its review, OES forwarded the position description to HRD, which reviewed it to determine whether to approve the position description.  Once the position description was approved, HRD returned it to OES who then returned it to Ms. Craddock. (Craddock Depo. at 29-30).

Plaintiff Russell became immediately aware that the MAS2/HRC position was available because she prepared the job posting. (Russell Depo. at 186).  But Plaintiff did not apply for the

MAS2/HRC position because she did not meet the PSMQ's. (Russell Depo. at 187; Craddock Depo. at 20).

Plaintiff Russell alleges that Ms. Craddock, an African-American, added the PSMQs to prevent Plaintiff from getting the position because of her race. (Russell Depo. at 190). Plaintiff further alleges that she would have applied for the MAS2/HRC position if the PSMQ's had not been added, because she supposedly already performed 50 percent of the position's duties. (Russell Depo. at 188). Plaintiff asserts that she met the requirements for the MAS2/HRC position before the PSMQ's were added and that the PSMQ's were unnecessary. (Russell Depo. at 194).

The applicant who received the position was Patty Magazine, who is Caucasian. (Russell Depo. at 190). Unlike Plaintiff Russell, Ms. Magazine had previous experience working with labor unions, writing position descriptions, and conducting interviews, which are requirements of the current position. (Craddock Depo. at 30). Once Ms. Magazine began at ITSD in January 2004, she became Plaintiff's direct supervisor. (Russell Depo. at 182).

Plaintiff Russell admits that she cannot say that Ms. Magazine is less qualified for the MAS2/HRC position then Plaintiff, but Plaintiff believes Ms. Magazine required some training, and believes that she too could have filled the MAS2/HRC position if she had received training. (Russell Depo. at 190, 211). Plaintiff believes that discrimination occurred merely because Ms. Magazine is white. (Russell Depo. at 190).

**E.    Other alleged adverse or retaliatory actions**

**1.    Change in Plaintiff's work hours**

From Plaintiff Russell's first days at the SOCC in 1997, until July 2004, she maintained a schedule of four 10-hour days. (Russell Depo. at 211). In July 2004, Plaintiff's schedule

changed to five 8-hour days with a required one-hour lunch period. (Russell Depo. at 212).  Ms.

Magazine informed Russell in an email that all business support staff – not just Russell – was

being required to be on duty during core business hours. (Russell Depo. at 212; Ex. 20).  When

Plaintiff questioned why one Tom Landoll would not have to change from a four-day to a five-

day schedule, Ms. Magazine explained that Landoll was not an employee of Business Services,

so his schedule was not comparable to Plaintiff's. (Russell Depo. at Ex. 20).

      Plaintiff Russell next wrote twice to Ms. Craddock, asking why her schedule was

changed but Landoll's schedule was not, and demanding reinstatement to her prior schedule.

Ms. Craddock's response was similar, and the request was denied. (Russell Depo. at Ex. 20).

Plaintiff Russell then appealed to Mr. Hess, and then his supervisor, Assistant Director Greg

Jackson, but received no response from either. (Russell Depo. at 218; Ex. 20].

Plaintiff then wrote to the EEOC and the Ohio Inspector General's ("OIG's") Office,

complaining about the schedule change. (Russell Depo. at 219).  Neither the EEOC nor the OIG

responded. (Russell Depo. at 219-20).

### 2.      Ms. Craddock's letter to OES

      In the summer of 2004, Plaintiff Russell wrote three letters concerning Ms. Craddock –

one to the EEOC and two to the OIG.  Plaintiff first wrote to the OIG on June 11, 2004 regarding

why she believed Ms. Craddock's position was over-classified. (Russell Depo. at Ex. 7).  On

June 29, 2004, Plaintiff wrote to the EEOC, alleging that Ms. Craddock had reduced Plaintiff's

job duties and changed Plaintiff's work schedule in retaliation for Plaintiff's having filed her

EEOC charge on June 2, 2004. (Russell Depo. Ex. 21).

      Ms. Craddock then sent a memorandum to DAS's Human Resources Administrator

"requesting the assistance of the department to take the appropriate action to put a stop to this

harassment." (Russell Depo. at Ex. 22; Craddock Depo. at 32). ODAS took no action on Ms. Craddock's complaint while the EEOC charge was being investigated. Plaintiff Russell did not learn of Ms. Craddock's letter to OES until she was contacted by Gary Allbright, an EEO officer investigating Craddock's allegations, on January 26, 2005. (Russell Depo. at Ex. 23). In February 2005, Mr. Allbright issued a terse report finding that Plaintiff had the right to file complaints with the OIG and charges with the EEOC, and to request public records. (Russell Depo. at Ex. 24).

Plaintiff Russell's final letter to the OIG, dated August 16, 2004, alleged that Ms. Barbee abused her time, but that Plaintiff is the one who was "punished" by Ms. Craddock, because her work schedule was changed and Ms. Barbee's was not. Plaintiff Russell also alleged that Ms. Craddock did not enforce work rules because Ms. Craddock gave Ms. Barbee only a written reprimand for alleged abuse-of-time violations, and speculated that if Plaintiff had violated these same rules, Ms. Craddock would have "prosecuted" Plaintiff to the fullest extent of the law and DAS rules. Finally, Plaintiff Russell requested that Ms. Craddock be "held accountable." (Russell Depo. at Ex. 6).

## F.    Plaintiff's Complaint

On June 2, 2004, Plaintiff filed her Title VII charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"). The EEOC investigated Plaintiff's claims, and dismissed the charge on November 15, 2004. On February 11, 2005, Plaintiff filed the Complaint in the present action alleging that she was subjected to disparate treatment based on race and age, retaliation, and a violation of 42 U.S.C. § 1983. Plaintiff has abandoned her age discrimination claims. Plaintiff has also petitioned the Court for injunctive relief from Defendants' alleged ongoing retaliation against Plaintiff for

filing an EEOC charge.

## II.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which

provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter
> of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate,

however, if the opposing party fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial

Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable

inferences in favor of the nonmoving party, and must refrain from making credibility

determinations or weighing the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150-51 (2000).[2]   The Court disregards all evidence favorable to the moving party that the

---

[2]  *Reeves* involved a motion for judgment as a matter of law made during the course of a
trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56.
Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable
difference, however, is that in ruling on a motion for judgment as a matter of law, the Court,
having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S.
at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of
the evidence, and accordingly the non-moving party has the duty to point out those portions of
the paper record upon which it relies in asserting a genuine issue of material fact, and the court
need not comb the paper record for the benefit of the nonmoving party.  *In re Morris*, 260 F.3d

jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id., quoting Liberty Lobby*, 477 U.S. at 257. The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

## III.  DISCUSSION

Plaintiff Russell alleges that she was subject to discrimination, a hostile work environment, and was retaliated against in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.  Defendants have moved for summary judgment with respect to all claims.

Additionally, Plaintiff has petitioned the Court for injunctive relief from Defendants' alleged ongoing retaliation against Plaintiff for filing an EEOC charge.  The Court has reviewed Plaintiff's petition and finds such provisional relief unwarranted.  Therefore, Plaintiff's petition for injunctive relief is denied.  The Court has, however, considered the allegations in Plaintiff's petition in analyzing Plaintiff's hostile environment and retaliation claims. (*See infra*, Sections III.C; III.D).

### A.    Statute of Limitations Issues

Defendants argue that some of Plaintiff Russell's claims are barred by the statute of limitations.  This Court agrees.

Because the alleged unlawful practices occurred in Ohio, which is a deferral state, Plaintiff Russell is required by § 2000e-5(e)(1) to file her charges of unlawful practices with the EEOC within 300 days or she will lose her ability to recover for it.  *Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001) (*citing Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999)*, cert denied*, 528 U.S. 1154 (2000)). For a civil rights action arising in Ohio under 42 U.S.C. § 1983, "the appropriate statute of limitations . . . is contained in Ohio Rev. Code Ann. § 2305.10, which requires that the actions for bodily injury be filed within two years after their accrual." *Banks v. City of Whitehall,* 344 F.3d 550, 553 (6th Cir. 2003).

Plaintiff filed her charge with the EEOC on June 2, 2004 alleging race and age

discrimination.  Plaintiff's Complaint in the present action, in which Plaintiff also alleges a violation of 42 U.S.C. § 1983, was filed on February 11, 2005.  Thus, for Plaintiff's Title VII discrimination charge to have been timely, all alleged unlawful employment practices must have occurred after August 6, 2003.  For Plaintiff's § 1983 action to be timely, all alleged acts must have occurred on or after February 11, 2003.

Defendants point out that Title VII's statute of limitations has run on the following incidents:  denial of Plaintiff's re-classification request of April 4, 2003; the transfer of Ms. Weis to the SCC on June 1, 2003; and the reclassification of Ms. Barbee effective July 28, 2002. Additionally, the § 1983 statute of limitations regarding Ms. Barbee's reclassification has also run.  Plaintiff Russell argues that these claims are not barred by virtue of the "continuing violation doctrine." (Pl's Memo. in Opp. at 38).

Though a continuing violations doctrine exists, this doctrine is not applicable in the present case.  For purposes of determining whether a Title VII plaintiff has complied with statutory time limitations, the U.S. Supreme Court, in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), has drawn a distinction between discrete discriminatory acts and a series of separate acts that collectively constitute a hostile work environment.  After analyzing the nature of hostile work environment claims, the *Morgan* Court concluded that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside of the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117.  This doctrine is not available to Plaintiff, however, because she has not alleged facts sufficient to support a hostile environment claim. (*See infra*, Section III.C).

20

Accordingly, the following Title VII claims fail as untimely: denial of Plaintiff's re-classification request of April 4, 2003; the transfer of Ms. Weis to the SCC on June 1, 2003; and the reclassification of Ms. Barbee effective July 28, 2002. Additionally, Plaintiff's § 1983 claim regarding Ms. Barbee's reclassification has also run. Defendants are consequently entitled to summary judgment on these claims. The Court will continue to analyze the merits of these claims as an alternative basis for granting summary judgment.

**B.      Race Discrimination Claims**

Plaintiff Russell alleges that Defendants have failed to promote or reclassify her and have taken job duties away from her and otherwise discriminated against her, because of her African American race. In addition, Plaintiff appears to assert a disparate impact claim.

Claims of discrimination under Title VII and 42 U.S.C. § 1983 are analyzed using the same basic framework. *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (*citing Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988); *Daniels v. Board of Educ.*, 805 F.2d 203, 206-07 (6th Cir.1986); *Grano v. Department of Dev.*, 637 F.2d 1073, 1081-82 (6th Cir.1980)). To succeed under her § 1983 claim, however, Plaintiff must demonstrate in addition that Mr. Hess personally participated in, or ratified, the discrimination. *See Adair v. Charter County of Wayne*, 452 F.3d 481, 493 (6th Cir. 2006) (*citing Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694-95 (1978).

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1).

**1.      Disparate Treatment**

21

In order to establish an employment discrimination case, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment.  *White v. Columbus Metropolitan Housing Auth.,* 429 F.3d 232, 238 (6th Cir. 2005).  Plaintiff Russell has not offered direct evidence of race discrimination, but contends she can state a *prima facie* case of race discrimination using circumstantial evidence. (*See* Pl's Memo. in Opp. at 39-57).

Defendants argue, and this Court agrees, that they are entitled to summary judgment because Plaintiff was properly classified and also because Plaintiff cannot establish a *prima facie* case of race discrimination because she is unable to identify similarly situated employees who were treated differently. (Def's Mot. for Summ. J. at 17-25; Def's Reply at 3-6).

The elements of a *prima facia* case of employment discrimination based on race are: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff.  *See Id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Id.*; *Burdine*, 450 U.S. 248, 253.  "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading

22

the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S.248, 253.

This burden-shifting framework is intended to be flexible in differing factual circumstances. *See Christian v. Wal-Mart Stores, Inc,.* 252 F.3d 862, *869 -870 (6th Cir. 2001) *citing Burdine,* 450 U.S. at 254 n. 6.  In order to state a *prima facie* case of race discrimination in failure to promote, a plaintiff is required to show that: "(1) [s]he was a member of a protected class; (2) [s]he applied and was qualified for a promotion; (3) [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).  "[A] plaintiff is not required to establish that she applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion." *Id*. at 1022.  To the extent Plaintiff Russell is claiming that she should have been given the positions now occupied by Mses. Magazine, Barbee or Weis, only Ms. Magazine's movement constituted a promotion; Ms. Barbee was laterally reclassified, and Ms. Weiss was reassigned in the same classification.  Ms. Magazine's position was posted, and Plaintiff knew about it, but chose not to apply because she believed the PSMQ's disqualified her.  Therefore, Plaintiff must demonstrate (1) that the PSMQ's were added by Ms. Craddock to prevent African-Americans from applying; and (2) that the PSMQ's truly disqualified Plaintiff.

Insofar as Plaintiff Russell claims she should have been reclassified upward, into the positions given to Ms. Weis, Ms. Barbee or others, a third permutation of the *McDonnell Douglas* is applicable:

> In order to prove a *prima facie* case for failure to reclassify, the employee may prove that: "(1) positions held by comparable white employees were reclassified and upgraded; or (2) the difference in the grades was the result of racial considerations." *Johnson v. Auburn Univ.,* 403 F. Supp.2d 1101, 1109 (M.D. Ala. 2005) (*citing Moore v. Devine*, 767 F.2d 1541, 1546 (11th Cir. 1985).

*Goldwair v. Ohio Dept. of Youth Servs.*, 2006 WL 940548 at *8 (Frost, J.) (S.D. Ohio 2006).  In *Goldwair*, the court considered as comparators only those white employees reclassified into the classification desired by the Plaintiff. *Id*. at 15.

The parties dispute whether Plaintiff Russell has proved that she was treated differently from her putative comparable employees that were similarly situated.  Additionally, the parties dispute whether Plaintiff has met her burden to prove that Defendants' proffered reasons for not reclassifying Plaintiff are a mere pretext for discrimination.

### a.      Treatment Different Than Similarly Situated Employees

To be deemed "similarly situated," the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the *relevant* aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).

Plaintiff claims she is similarly situated to each of the following non-minority employees who received more favorable treatment than she did: Ms. Barbee, Ms. Weiss, Ms. Magazine,

Debra Daughtery, Stuart Davis, Daniel Orr, Dixie Rogers, Richard Shipley, Paul Hahn, Virginia Dillon, Todd Barnhouse, Shelley Iulianelli, Stephen Polinsky and Thomas Landoll. (Pl's Memo. in Opp. at 43-57). With the exception of Mses. Barbee, Weis and Magazine, Plaintiff makes almost no attempt to set forth the putative basis for regarding the other listed employees as similarly situated to her. Plaintiff merely asserts that Mr. Hess directly or indirectly supervised the putative comparators or that they were promoted or reclassified. This is insufficient evidence for a determination that the putative comparators are similarly situated. Therefore, the Court will now examine Plaintiff's claims with respect to Mses. Barbee, Weis and Magazine.

### i.    Ms. Barbee

Ms. Barbee was reclassified from a Training Supervisor to an AA4. Plaintiff Russell admits that "I would not have received [Ms. Barbee's] position because it was a security coordinator and construction, and if you look at the set of duties, I don't have the qualifications for that set of duties." (Russell Depo. at 150). Because Plaintiff admits she was not qualified for the position, Ms. Barbee is relevant only as a putative "comparable" in Plaintiff's claim that she should have been reclassified upward.

Plaintiff deems herself similarly situated to Ms. Barbee based on the fact that Ms. Barbee subsequently held a position in the same classification series as Plaintiff and that Mr. Hess supervised them. (Pl's Memo. in Opp. at 48-49). Plaintiff has no personal knowledge, however, of Ms. Barbee's duties before or after she became an AA4, and Plaintiff was not doing the same duties, nor was she qualified to do the same duties assigned to Ms. Barbee. Plaintiff cites O.A.C. § 123:1-24-02 as statutory evidence that Mr. Hess violated civil service laws because 85 percent of Ms. Barbee's job duties from position description to position description did not overlap. (Pl's Memo. in Opp. at 45). This code section is completely irrelevant, however, in that it

25

concerns "criteria for retention of certification," which Plaintiff has not alleged was the reason for Ms. Barbee's reclassification.  Moreover, Ms. Barbee was reclassified *laterally* so that her classification more closely matched her job duties as they had evolved, while Plaintiff is requesting an upgrade to a higher position.  Ms. Barbee received no increase in her pay range, step, or base rate when she assumed the AA4 classification.  On the other hand, if Plaintiff were reclassified to an AA4, she would receive an increase in her pay range, step and base rate.

Finally, reclassifying an employee to most closely match the employee's actual duties is required by O.R.C. § 124.14.  Compliance with civil service law is a legitimate, non-discriminatory reason.

### ii.    Ms. Weiss

Ms. Weis worked for DAS in the E-government section as an AA3 before being moved to the SOCC in the Enterprising Computing Services ("ECS") section because the E-government section was abolished. (Russell Depo. at 175; Hess Depo. at 73).  The reassignment was recommended by OES – not initiated by Mr. Hess – and the AA3 position at ECS was not posted because Ms. Weis' move was a lateral one in response to the reorganization. (Hess Depo. at 73, 75-76).  Mr. Hess merely approved the reassignment, but had no other involvement. (Hess Depo. at 76).

Defendants point out, and this Court agrees, that Plaintiff Russell and Ms. Weis were not similarly situated because Ms. Weis was already occupying the AA3 classification, to which Plaintiff Russell merely aspired.  Plaintiff has not come forth with evidence suggesting that Ms. Weis was inappropriately classified as an AA3 either before or after her reassignment. Furthermore, Defendants' efforts to avoid the unnecessary layoff of an employee is a legitimate

26

non-discriminatory reason for Ms. Weiss' reassignment.  Indeed, Plaintiff acknowledged that she

too had been treated in the same manner in which Ms. Weis was treated -- when Plaintiff's

previous position was abolished, she was placed in an AA4 position, which had not previously

existed, instead of being removed or terminated. (Pl's Memo. in Opp. at 5; Russell Depo. at

181).

### iii.    Ms. Magazine

#### (a)    Failure to Reclassify

Patty Magazine was promoted to the MAS2/HRC position in January 2004, after

PSMQ's were added.  Plaintiff has no personal knowledge about Ms. Magazine's qualifications,

and has no reason to believe Ms. Magazine was not qualified for the position.  (Russell Depo. at

211).  Plaintiff Russell, on the other hand, admits she did not meet the PSMQ requirements and

therefore did not qualify for the MAS2/HRC position. (Russell Depo. at 187).  In addition to

Plaintiff's admission, this Court has reviewed the MAS2/HRC position's job duties[3] and has

---

[3]The job posting listed the job duties for the position as follows:

Serves as Information Technology Service Delivery (ITSD) Human Resources
(HR) Support Manager (i.e. employee relations, payroll, records retention, special
events planning & special projects). Acts as HR Coordinator to division
employees, managers & supervisors on all aspects of human resources (e.g. IT
recruitment for highly complex technical positions, classification issues, staffing
needs, definition of duties, determination of appropriate classifications for
position, workplace safety). Formulates and implements personnel policies &
procedures; develops & administers division work rules; conduct new employee
orientation & exit interviews. Provides assistance & analysis to managers in
planning process for future staffing needs. Write position descriptions for new
positions & makes changes to current ones; prepares &/or oversees preparation of
personnel paperwork (e.g. Personnel Actions, Personnel Action Requests, Job
Opportunity Postings); reviews job applications for ITSD positions; recommends
candidates to interview; develops assessment & structured interview questions in
conjunction with managers; participates in structured interview. Administers
ITSD online payroll system; monitors & analyzes payroll discrepancies. Monitors

determined that the MAS2/HRC position is not comparable to the position Plaintiff held, or any position to which she could have been reclassified within the AA classification series.  Because Plaintiff Russell was not qualified for this position, she cannot use it as the basis for a discriminatory failure to promote claim.

Plaintiff instead alleges that she would have applied for the position if the PSMQs had not been added, though she never communicated this to Ms. Craddock or to Mr. Hess. (Russell Depo. at 188).  Ms. Craddock requested the addition of the PSMQs and went through an extensive process of obtaining approvals from OES and HRD before adding the PSMQs to the job posting. (Craddock Depo. at 26-30).

### (b)      Addition of PSMQ's

Plaintiff Russell alleges that, around September 2003, PSMQ's were added to the required qualifications for the MAS2/HRC position to thwart Plaintiff from applying for the position as a form of racial discrimination and/or retaliation. (Russell Depo. at 187-88; Ex. 19). The original minimum qualifications for an MAS2 were:

> Completion of undergraduate major core program in business or public administration; 2 yrs. Exp. In management analysis; **OR** completion of undergraduate core coursework in academic field commensurate with program area to be assigned as outlined per approved position description on file; 2 yrs. Exp. In management analysis; **OR** 4 yrs. Exp. In planning & coordinating management evaluation & monitoring programs; **OR** 1 yr. exp. As Management Analyst Supervisor 1 (63215); **OR** equivalent of Minimum Qualifications for employment noted above.

[Russell Dep. Exh. 19].

_____

> & tracks employee evaluation process. Evaluates internal training needs & monitors employee training data.

(Russell Depo. at Ex. 19).

Plaintiff is a high school graduate, who attended Katherine's Business School in Cumberland, Maryland, and Franklin University in Columbus, Ohio, for a total of two years, concentrating in accounting. (Russell Depo. at 10-11).  The rest of her experience is from on-the-job training. (Russell Depo. at 13).  Thus, Plaintiff did not meet the minimum qualifications for the MAS2/HRC position even without the PSMQ's, and the addition of the PSMQ's could not have been an adverse or retaliatory action toward Plaintiff.

The PSMQ's that were added required:

> 12 mos. exp. or 12 mos. trg. in human resources management (e.g., IT recruiting, classification issues, staffing needs, definition of duties, determination of appropriate classifications for positions; workplace safety); 12 mos. exp. or 12 mos. trg. in interpretation & application of collective bargaining contracts, Ohio Revised Code, Ohio Administrative Code & federal laws, rules & regulations related to human resources issues (e.g., discipline, hiring, grievances, layoffs).

(Russell Depo. at Ex. 19).

Apart from conclusory allegations, Plaintiff Russell has not come forth with any evidence to suggest Defendants added these PSMQ's to thwart her application or for racially discriminatory reasons.  Instead, Defendants assert that these additional requirements are relevant because MAS2 is a rather broad classification, and Ms. Craddock, in collaboration with the Office of Employee Services, and the Human Resources Department (not Mr. Hess as Plaintiff suggests), wanted to use PSMQ's to narrow the field of applicants to those with significant personnel experience. (Craddock Depo. at 24-25).  This included experience in the area of labor relations, experience Plaintiff lacked. (Craddock Depo. at 23; *See generally*, Russell Depo.).  Even without the addition of the PSMQ's,  Ms. Magazine's superior qualifications are a differentiating circumstance that distinguishes her from Plaintiff.

29

In conclusion, Plaintiff has not met her burden to establish that she was similarly situated to Mses. Barbee, Weiss or Magazine, and consequently, she has failed to establish a *prima facie* case of disparate treatment based on race. Accordingly, Defendants are entitled to summary judgment on this claim.

### b. Pretext

Defendants argue that even if Plaintiff is able to make a *prima facie* showing of racial discrimination, Plaintiff's claims must fail because Defendants had a legitimate business reason not to reclassify Plaintiff and Plaintiff identifies no evidence establishing that Defendants' explanation for its actions is pretextual. (Pl's Mot. for Summ. J. at 25). This Court agrees.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.* (*quoting Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer

made a reasonably informed and considered decision before taking the adverse employment action.  *Id.*  The Court should not blindly accept the proffered reason as honest. *Id.*  If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In the instant case, Defendants have articulated legitimate, non-discriminatory reasons for not reclassifying Plaintiff.  More specifically, Defendants assert that Plaintiff was already properly classified, and Defendants had no need for a higher level employee in her position.

Defendants explain that Plaintiff Russell never worked outside, or at least above her AA2 classification. (Pl's Mot. for Summ. J. at 26).  The Court has reviewed the distinctions between the classifications in the AA classification series and Plaintiff's actual job duties, and agrees that she is in the proper classification.  Ohio civil service law does not provide a means merely to "upgrade" or reclassify individuals who are working within the appropriate classification. The sole means of obtaining a higher classification would be through promotion.

Throughout her entire employment with SOCC, Plaintiff Russell never took the initiative to apply for a promotion.  Moreover, if Plaintiff believed she should be reclassified based on her job duties, she should have requested an audit pursuant to O.R.C. § 124.14(D), an option Plaintiff admitted she was aware existed.  Finally, Plaintiff has introduced no evidence

demonstrating that ODAS needed a position that functioned above Plaintiff's level, but below Ms. Magazine's.

In conclusion, viewing the evidence in the light most favorable to Plaintiff Russell, the Court finds that Plaintiff has failed to adduce evidence from which a rational trier of fact could reasonably infer that Defendants' proffered reasons had either no basis in fact or were not the actual reason Ms. Russell was not reclassified.  Thus, Plaintiff is unable to establish pretext as a matter of law.  For this additional reason, Defendants are entitled to summary judgment in their favor on Plaintiff's disparate treatment claims.

### 2. Disparate Impact

Though it is not entirely clear whether or not Plaintiff Russell is proceeding on a pattern-or-practice theory of discrimination, the Court will analyze such a claim.

Plaintiff Russell has alleged that Defendants have a policy or practice of "us[ing] various methods to advance white employees," while not using such methods to advance African American employees. (*See* Pl's Memo. in Opp. at 40).

A disparate impact analysis is appropriate when a plaintiff claims that an employer's facially neutral policy adversely affects a protected class.  *Griggs. v. Duke Power Co.,* 401 U.S. 424, 431 (1971).  Typically, the disparate impact analysis is used in a class action, but the Sixth Circuit has stated that it may also form the basis for an individual claim.  *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576-77 (6th Cir. 2004) (*citing Gantt v. Wilson Sporting Goods*

*Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998)).

A *prima facie* case is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005) (*citing Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994). Once a *prima facie* case is proven, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment practice. *Johnson*, 30F.3d at 48. The burden then shifts back to plaintiff to prove either pretext or that a less discriminatory practice existed which would achieve the same business ends. *Id*.

The Court finds that Plaintiff cannot maintain a viable disparate impact claim because the Court must exclude Plaintiff's chart and statistics. First, the chart and statistics are unauthenticated and appear to be Plaintiff's own creations. Second, the chart offered by Plaintiff is not relevant to the particular issue of discrimination (whether characterized as disparate impact or disparate treatment). As the Sixth Circuit stated, "the mere presence of a disparity in an employer's work force is not enough to establish a *prima facie* case of disparate impact. Disparities occur naturally in work forces for a multitude of non-discriminatory reasons." *Abbott v. Forge, Inc*., 912 F.2d 867, 875 (6th Cir. 1990). For example, Plaintiff's statistics are not sufficiently probative to infer discrimination because they fail to provide information on the number of qualified persons in the protected class in the relevant labor pool. *See e.g., Simpson v. Midland-Ross Corp.,* 823 F.2d 937, 943 (6th Cir. 1987). Thus, the Court concludes that Plaintiff's chart and statistics lack sufficient weight to support a claim of race discrimination and, therefore, Defendants are entitled to summary judgment on this claim.

**C.      Hostile Environment**

Ms. Russell alleges that "[t]here has been a pattern and practice of discrimination against [her] for many years" and "she has been a victim of continual racial discrimination for a number of years"; and finally, that she has suffered "more than 30 years of opportunities lost to racism." (Pl's Memo. in Opp. at 38-39). **Defendants argue that Plaintiff cannot demonstrate an actionable hostile work environment because Plaintiff has failed to show that she was subject to severe and pervasive harassment based on her race. (Def's Reply at 8-9).** The Court agrees with Defendants.

To establish a claim under Title VII for hostile work environment the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment, either through words or actions, based on race; (3) the harassment unreasonably interfered with plaintiff's work performance and created a hostile or offensive work environment that was severe and pervasive; and (4) the employer knew or should have known of the charged harassment and unreasonably failed to take prompt and appropriate corrective action. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-36 (6th Cir. 1996); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999); *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Id.* at 21-22. Isolated

incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).  Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include:

1.   the frequency of the discriminatory conduct;

2.   the severity of the discriminatory conduct;

3.   whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance;

4.   whether the discriminatory conduct interferes with an employee's work performance; and

5.   whether the plaintiff actually found the environment abusive.

*Id.* at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting factors from *Harris*).  The Court has explained:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80 . . . We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In the instant case, Plaintiff Russell has made no claims of intimidation, ridicule or insult by Defendants.  Moreover, Plaintiff admits she has never heard any of her supervisors (Mr.

Hess, Ms. Craddock, Ms. Magazine) make a racial slur or comment in her presence. (Russell Depo. at 226, 229-30). Plaintiff alleges that Ms. Craddock, who is African-American, created a hostile work environment for Plaintiff by emailing her concerns about Plaintiff to ODAS' EEO officer. (Pl's Memo. in Opp. at 62). Plaintiff admits she was unaware that Ms. Craddock made any complaints until shortly before ODAS' EEO office dismissed the informal complaint outright, with no repercussions to Plaintiff. (Plaintiff Depo. at 24; Exs. 23 and 24). Plaintiff Russell has also alleged that other employees will not speak to her in the presence of Mr. Hess or Ms. Craddock. (Pl's Memo. in Opp. at 62). Finally, Plaintiff, in her Petition for Injunctive Relief, claims her work environment is hostile because (1) she has been threatened with disciplinary action if an assignment was not completed on time and did once receive a verbal reprimand for an admitted failure to completing an assignment on time; (2) her supervisor interacts with her mainly through e-mail; (3) her assignments have deadlines; and (4) because she does not enjoy a good working relationship where her and her supervisor socialize and do things like eat breakfast together. (Pl's Pet. for Inj. Relief at 4).

Based upon the evidence Plaintiff Russell has submitted, the Court concludes that even when the evidence is viewed in

the light most favorable to her, Plaintiff has fallen far short of demonstrating that she was subjected to a hostile work environment. As set forth *supra*, Title VII is not a "general civility code." Accordingly, Defendants are entitled to summary judgment in its favor on Plaintiff's hostile work environment claim.

**D.      Retaliation**

Plaintiff Russell alleges that the following actions were taken by Defendants in retaliation for filing a prior EEOC charge: (1) the denial of opportunities for advancement; (2) a reduction in Plaintiff's duties; (3) a change in Plaintiff's work hours; (4) the letter alleging harassment written by Ms. Craddock to the OES; and (5) oral reprimand for not completing assignments by their due dates. (Pl's Memo. in Opp. at 59-63; Pl's Pet. for Inj. Relief at 2-3).

Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff cannot establish a *prima facie* case of retaliation. Defendants further argue that it had legitimate, non-retaliatory reasons for all of its actions regarding Plaintiff and that she cannot establish that such actions are pretextual. This Court agrees.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* case of retaliation are:

> (1) that he engaged in activity protected by Title VII; (2) that the defendant knew of this exercise of his protected rights; (3) that the defendant consequently took an employment action adverse to plaintiff; and (4) that there is a causal connection between the protected activity and the adverse employment action.

*Stouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001); *see also Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986) *cert. denied*, 478 U.S. 1006 (1986).  A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation.  *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253.

### 1.      Denial of Opportunities for Advancement

Plaintiff contends that Defendants retaliated against her by denying her several opportunities for advancement.  (Pl's Memo. in Opp. at 59).  More specifically, Plaintiff claims that she was retaliated against when: (1) Ms. Barbee was reclassified to an AA4; (2) Ms. Weis was laterally transferred to SOCC as an AA3; and (4) Ms. Magazine was employed by ITSD to fill the MAS2/ HRC position. (Pl's Memo. in Opp. at 59-60).  The Court has discussed each of these alleged denials of opportunities for advancement (*See supra*, I.D. and III.B.1.a.i-iii).

Based upon the evidence Plaintiff has submitted, the Court finds that Plaintiff cannot establish the requisite causal link for a *prima facie* case and also that Plaintiff is unable to show

that Defendants' proffered non-retaliatory reasons for its actions are a mere pretext for

retaliation.  To establish the causal connection required in the third prong, a plaintiff must

adduce "sufficient evidence from which an inference could be drawn that the adverse action

would not have been taken" but for the plaintiff's participation in a protected Title VII activity.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The Sixth Circuit noted:

> Although no one factor is dispositive in establishing a causal connection,
> evidence that defendant treated plaintiff differently from similarly situated
> employees or that the adverse action was taken shortly after the plaintiff's
> exercise of protected rights is relevant to causation.

*Nguyen*, 229 F.3d at 563.

In the instant case, Plaintiff fails to present evidence sufficient to permit an inference that

any of the alleged denials of opportunities for advancement would not have occurred but for her

filing of an EEOC charge.

### 2.    Reduction in Plaintiff's Duties

Plaintiff claims that Mr. Hess retaliated against her in June 2004, when he sanctioned the

reduction of her work to clerical duties.  (Pl's Memo. in Opp. at 60).  Defendants dispute that an

adverse action was taken to reduce Plaintiff's duties and further assert that any alleged

fluctuation in Plaintiff's duties was not attributable to retaliation. (Def's Mot. for Summ. J. at 32-

35).

Plaintiff alleges that when she first arrived at the SOCC in 1997, she performed duties

that were clerical in nature, although she remained an AA2. (Russell Depo. at 180).  Once Mr.

Hess took over Plaintiff's direct supervision, Plaintiff alleges that she began to perform

personnel functions for the ODN division acting as a "go-between for managers at ODN and

OES. (Russell Depo.  at 16, 20).  While working for Ms. Craddock, Russell continued to perform the same duties she performed for Mr. Hess, but she had an increase in work volume because five divisions merged into one large division. (Russell Depo. at 49-50).

Plaintiff Russell asserts that her work load diminished in the summer of 2003, after she asked Mr. Hess for an "upgrade." (Russell Depo. at 56).  Plaintiff explained that her interaction with managers decreased until she interacted only with the managers' administrative assistants, who are within Plaintiff's same classifications series. (Russell Depo. at 59, 98-100).  Defendants point out that to the extent the alleged diminution was completed by August 6,  2003, the claim is untimely under Title VII.  Plaintiff also alleges another reduction in her duties occurred after Ms. Magazine began as Human Resources Coordinator. (Russell Depo. at 61).

Although Plaintiff characterizes her duties as "clerical," she continued to perform the same duties as before, with the change being the information flow through which she gathered the data to complete the relevant forms. She either communicates with Ms. Magazine or the managers' assistants instead of directly with OES or the managers themselves.  Defendants argue, and this Court agrees, that the change in information flow is not relevant to Plaintiff's classification level.  (Pl's Mot. for Summ. J. at 33).  The Court finds that the mere change in individuals from whom Plaintiff received the information does not amount to an adverse action where Plaintiff's job duties were not changed such that it would lead to reclassification if the position were audited under O.R.C. § 124.14. *See Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996) (A transfer or reassignment of duties "that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.  A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.").

40

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), *quoting Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662. "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indicies unique to a particular situation." *Smith,* 378 F.3d at 575-76, *quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Applying the foregoing law, this Court finds that the alleged retaliatory action of diminishing Plaintiff's duties did not amount to a materially adverse change in the terms and conditions of Plaintiff's employment. Further, to the extent Plaintiff's workload did fluctuate, the Court finds that there is no evidence that this occurred for retaliatory reasons. Instead, the Court finds that it was natural for Plaintiff, who was involved in personnel functions, to experience fluctuations with the initial formation of ITSD and the subsequent staffing of the HRC position.

### 3.    Change in Plaintiff's Work Schedule

Plaintiff alleges that she was retaliated against in May 2004, when she was required to work five days a week. (Pl's Memo. in Opp. at 20, 60). The Court notes that this could only be retaliatory as the result of Plaintiff's oral complaints to Mr. Hess regarding her new schedule, because Plaintiff was notified of the schedule change *before* she filed her EEOC charge.

The Court finds that under the foregoing standards, a change in hours, without more, is insufficiently material to sustain a retaliation claim.  It is not enough that Plaintiff asserts she was inconvenienced by the change.  Regardless, there is no evidence that the schedule change was retaliatory.  Plaintiff was informed repeatedly that the change in her schedule was due to a change made for the entire ITSD Division of which she is an employee.  The Court finds unpersuasive Plaintiff's efforts to compare herself to employees outside her division and with different supervisors.

### 4.    Ms. Craddock's Letter Alleging Harassment

Plaintiff Russell named Ms. Craddock in her June 2004 EEOC charge.  In addition, Plaintiff also sent several complaints to OIG.  On July 23, 2004, Ms. Craddock sent a memorandum to DAS's Human Resources Administrator "requesting assistance of the department to take the appropriate action to put a stop to this harassment.  ODAS took no action on Ms. Craddock's complaint while the EEOC charge was being investigated.  Then, in February 2005, EEO Manager Allbright issued a report finding that Plaintiff had the right to file complaints with the OIG and charges with the EEOC, and to request public records.  Ms. Craddock's letter seeking assistance was denied.  Thus, Ms. Craddock's letter did not adversely affect Plaintiff's employment, and therefore, does not amount to actionable retaliation.

### 5.    Oral Reprimand

Plaintiff Russell alleges Ms. Magazine gave her an oral reprimand for not completing her assignments by their due dates. Plaintiff asserts this was done in retaliation for filing an EEOC complaint. (Pl's Pet. for Inj. Relief at 5).  Plaintiff has filed a motion seeking injunctive relief from further discipline or threats of discipline.

The Court finds that Plaintiff is not entitled to the injunctive relief she requests.  "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres v. Westover*, 359 U.S. 500, 506-507 (1959).  The discipline Plaintiff complains of is minor and any such retaliation can be fully remedied by invoking standard Title VII remedies.  Accordingly, Plaintiff's Petition for Injunctive Relief is denied.

Additionally, the Court is without jurisdiction to entertain this particular claim of retaliation because the alleged retaliatory act occurred in January 2007, after Plaintiff had filed her EEOC charge and, as such, is beyond the scope of her underlying EEOC charge.  *See e.g.*, *Woodford v. Warrensville Developmental Ctr.*, 35 F.3d 567 at *1 (6th Cir. 1994).

In conclusion, the Court finds that Plaintiff Russell has failed to adduce evidence to support a *prima facie* case of retaliation sufficient to withstand Defendants' summary judgment motion.  Additionally, Plaintiff's retaliation claims must fail because Plaintiff is unable to show that Defendants' proffered non-retaliatory reasons for its actions are a mere pretext for retaliation.  Defendants are therefore entitled to summary judgment in their favor on Plaintiff Russell's Title VII retaliation claim.

## V.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 35) and **DENIES** Plaintiff's Petition for Injunctive Relief (Doc. 41).

The Clerk shall enter a final judgment in this case, dismissing all Plaintiff's claims with prejudice.

The Clerk shall remove Documents 35 and 41 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

     /s/ George C. Smith         
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**